# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Keith Anderson, 211 47th Street, NE, Washington, DC, 20019, on behalf of himself and all others similarly situated,<br><br>               Plaintiff,<br><br>v.<br><br>American Airlines Group Inc., American Airlines, Inc., Delta Air Lines, Inc., Southwest Airlines Co., United Continental Holdings, Inc., and United Airlines, Inc.,<br><br>               Defendants. | Case No. _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Keith Anderson, by and through his attorneys, on behalf of himself and all others similarly situated, brings this Class Action Complaint ("Complaint") against American Airlines Group Inc., American Airlines, Inc. (together, "American"); Delta Air Lines, Inc. ("Delta"), Southwest Airlines Co. ("Southwest"); United Continental Holdings, Inc. and United Airlines, Inc. (together, "United") (collectively "Defendants") and alleges, based upon personal knowledge, information, belief, and the investigation of counsel, as follows:

## NATURE OF THE ACTION

1.      This lawsuit is a proposed class action to recover damages and other appropriate relief based on Defendants' unlawful conspiracy, from at least January 1, 2009 to the present, to fix, raise, maintain and stabilize the price of domestic airline tickets. As set forth below, Defendants' conspiracy violates Section 1 of the Sherman Act of 1890, 15 U.S.C. § 1 ("Sherman Act").

## INTRODUCTION

2.      Since at least January 1, 2009 to the present, Defendants conspired to artificially inflate the price of domestic airfare, including by restricting capacity and engaging in conduct that limited price transparency to consumers seeking to purchase domestic airline tickets.

3.      The airline industry is susceptible to collusion due to the fact that it is controlled by a very small number of carriers. Recent major mergers have left the market with only four major players: American, Delta, Southwest and United. Together, these four carriers control over 80% of domestic flights. These mergers and the resultant market concentration have allowed Defendants to stifle competition in the airline market to the detriment of the consuming public.

4.      Specifically, Defendants agreed to restrict and control capacity – a practice that industry executives have referred to as "capacity discipline." As detailed herein, Defendants communicated with one another regarding any plans to add or restrict capacity and coordinated to control and monitor capacity in an effort to maintain domestic airline ticket prices at supracompetitive levels.

5.      Defendants have publicly scorned proposed announced capacity additions, resulting in withdrawal or modification of such capacity additions, evidencing that Defendants are able to effectively monitor and police their cartel.

6.      In addition to strict capacity restrictions, Defendants coordinated to minimize pricing transparency to the detriment of consumers who thus overpaid for domestic airline tickets.

7.      Prices for domestic airline tickets therefore were, and continue to be, artificially inflated. Moreover, as discussed herein, that prices continued to rise while the price of jet fuel plummeted further demonstrates that Defendants conspired to fix, raise, maintain, or stabilize the price of domestic airline tickets.

8.      As a result of Defendants' illegal conduct in restraint of competition, consumers, including Plaintiff and all members of the proposed Class, have been forced to pay supracompetitive prices for domestic airline tickets and thus have been harmed by Defendants' conduct.

## CLASS ALLEGATIONS

9.      Plaintiff brings this class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class of plaintiffs (the "Nationwide Class" or "Class") consisting of:

> All persons and entities who purchased domestic airline tickets directly from one or more Defendants from at least July 14, 2011 to the present (the "Class Period"). Excluded from the Class are governmental entities, Defendants, any subsidiaries or affiliates of Defendants, and any of Defendants' co-conspirators, whether or not named as a Defendant in this Complaint, and any judges or justices assigned to hear any aspect of this action.

10.     The class is so numerous that joinder of all members is impracticable.  On information and belief, thousands of individuals and entities purchased airfare from the Defendants during the Relevant Period.

11.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and all Class members share the same injury, as they were all damaged by the actions of Defendants which caused them to pay artificially inflated prices for airline tickets.

12.     Plaintiff will fairly and adequately represent and protect the interests of the Class members. Plaintiff's interests are coincident with, and not antagonistic to, those of the other Class members.

13.     Plaintiff is represented by counsel who are experienced and respected in the prosecution of class action and antitrust litigation.

14.     This case presents many common questions of law and fact that will predominate over any questions that may affect individual members of the Class, such as:

> a.   Whether the Defendants engaged in a conspiracy to raise, fix, and maintain prices of domestic airline tickets sold in the United States through, *inter alia,* coordinated capacity restrictions;
>
> b.   The duration and extent of the conspiracy;

c. Whether each Defendant was a participant in any such conspiracy;

d. Whether the actions of Defendants in so conspiring violated Section 1 of the Sherman Act;

e. Whether the conspiracy had the effect of artificially inflating the price of airline tickets sold in the United States during the Relevant Period;

f. Whether the conduct of the Defendants caused injury to Class Members; and

g. The measure and amount of damages incurred by the Class.

15.     Adjudicating the claims of the Class members as a class action is superior to the alternative, because it allows for the fair and efficient adjudication of the controversy alleged in this Complaint, while avoiding the risk that the prosecution of separate actions by individual members of the Class would create inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. This action presents no difficulties in management that would preclude its maintenance as a class action.

## JURISDICTION AND VENUE

16.     Plaintiff brings this action to obtain injunctive relief and treble damages, as well as reasonable attorneys' fees and costs, arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

17.     Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c), and (d) because all of the Defendants transact business in this district, and a substantial portion of the affected interstate trade and commerce was carried out in this district.

18.     Defendants are subject to the personal jurisdiction of this Court by virtue of their nationwide contacts and other activities, including because (1) each Defendant transacted business in this District; (2) each Defendant directly or indirectly sold and delivered domestic passenger air transportation in this District; (3) each Defendant has substantial contacts with this District; and (3) each Defendant engaged in

an illegal price-fixing conspiracy and agreement to limit capacity that was directed at, and had the intended effect of causing injury to, persons and entities residing in, locating in, or doing business in this District.

## PARTIES

19.     Plaintiff Keith Anderson is a resident of Washington, D.C. During the Class Period, Plaintiff purchased air passenger transportation services directly from one or more of the Defendants and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

**American Airlines**

20.     Defendant American Airlines Group Inc. is a holding company and the parent company of Defendant American Airlines, Inc. Both American Airlines Group Inc. and American Airlines, Inc. (together, "American") are Delaware corporations with their principal places of business located in Fort Worth, Texas.

21.     American was formed in December 2013 as a result of the merger of AMR Corporation, the previous parent company of American Airlines, and US Airways Group, the previous parent company of US Airways. The new American (consisting of American, American Eagle, US Airways and US Airways Express) is the largest airline in the world, operating nearly 6,700 flights per day to 339 destinations in 54 countries.

**Delta**

22.     Defendant Delta Air Lines, Inc. ("Delta") is a Delaware corporation with its principal place of business located in Atlanta, Georgia. Delta operates more than 5,400 flights per day to 326 locations in 64 countries.

**Southwest**

23.    Defendant Southwest Airlines Co. ("Southwest") is a Texas corporation with its principal place of business located in Dallas, Texas. Southwest carries the most domestic passengers of any U.S. airline. It operates more than 3,600 flights per day to 94 locations in the United States and six additional countries.

**United**

24.    Defendant United Continental Holdings, Inc. is a holding company and the parent company of Defendant United Airlines, Inc. Both United Continental Holdings, Inc. and United Airlines, Inc. (together, "United") are Delaware corporations with their principal places of business located in Chicago, Illinois. United operates more than 5,300 flights per day to 369 locations.

25.    The acts taken by Defendants, as alleged herein, were authorized, ordered and condoned by their respective parent companies and authorized, ordered and performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their business affairs.

26.    Various other persons, corporations, or firms not named as Defendants herein may have participated in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

## NON-PARTY CO-CONSPIRATORS

27.    On information and belief, at all relevant times, other airlines, entities, and/or persons, including, but not limited to, U.S. Airways (prior to its merger with American Airlines) willingly conspired with Defendants in their unlawful restraint of trade.  All averments herein against Defendants are also averred against these unnamed co-conspirators.

## INTERSTATE TRADE AND COMMERCE

28.     Defendants' conduct, as described in this Complaint, were within the flow of, were intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

29.     During the Class Period, Defendants sold airline tickets and provided airline travel services in a continuous and uninterrupted flow of interstate commerce throughout the United States and its territories. The price-fixing conspiracy in which Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## FACTUAL ALLEGATIONS

### A.  Domestic Passenger Air Travel

30.     Domestic passenger air travel is a homogenous service sold by airlines, including Defendants, to their customers, including Plaintiff and the members of the Class, primarily based on price. Domestic passenger air travel is a commodity product that is fungible because domestic air travel service provided by one airline is readily substitutable for any domestic air travel service provided by any other airline.

### B.  The Industry

31.     In 1978, Congress passed the Airline Deregulation Act ("ADA"), which freed the domestic airline industry from government regulation. Specifically, the ADA turned over control of fares, routes, and market entry of new airlines from the government to the market. Thus, free market forces should operate in the airline industry. However, market forces fail to explain the recent trend of increasing domestic passenger airfares.

32.     Defendants' ability to coordinate prices and capacity has become easier in recent years. Since 2005, the domestic airline industry has experienced significant consolidation, as discussed *infra* Section D.  The resultant market is dominated by only four major airlines that together control over 80% of the market, making the structure of the industry susceptible to coordinated conduct.

33.     As detailed herein, Defendants interact with one another through a variety of channels, which facilitate their collusion.  For example, Defendants are members of trade associations, including *inter alia* Airlines for America ("A4A") and the International Air Transport Association ("IATA").[1] Moreover, Defendants communicate directly with one another regarding competitive issues, including pricing, and also use financial analysts as conduits through which they pass information to one another.

34.     Defendants' pricing behavior, as discussed herein, has been inconsistent with a competitive market.

35.     In addition to rising airfares, mergers have led to decreased head-to-head by the Defendants. Associated Press has documented this point in a July 14, 2015 article:

> "Airlines aren't going at each other like they used to," said Mike Boyd, an aviation consultant frequently hired by airports. "They have their turf, and they very rarely go to the mattresses with one another."
>
> At 40 of the 100 largest U.S. airports, a single airline controls a majority of the market, as measured by the number of seats for sale, up from 34 airports a decade earlier. At 93 of the top 100, one or two airlines control a majority of the seats, an increase from 78 airports, according to AP's analysis of data from Diio, an airline-schedule tracking service.
>
> ****
>
> Still, "the airline industry is less competitive now than it used to be," said Seth Kaplan, managing partner of industry newsletter Airline Weekly. "Some of us used to have eight or nine airlines to choose from. Now we have maybe four or five, just as we have four or five cellphone companies to choose from."
> The mergers have altered the competitive landscape at airports big and small.
>
> — In Indianapolis, the two leading airlines controlled just 37 percent of the seats a decade ago, and domestic fares were 9 percent below the national average. Then the city's main airline, ATA, went bankrupt and was bought by Southwest, and its No. 2 carrier, Northwest, was absorbed by Delta. Now two airlines control 56 percent of the seats, and airfares are 6 percent above the national average.

---

[1] A4A is a trade organization of leading U.S. passenger and cargo carriers. Its members transport more than 90 percent of all airline passengers and cargo within the United States.
The IATA is an international trade association representing over 240 domestic and international airlines.

— The Dayton, Ohio, airport was served by 10 airlines in 2005, and fares were 5 percent below average. Today, just four airlines fly there and prices are almost 10 percent above average.

— Big hub airports aren't immune. In 2005, US Airways controlled nearly 66 percent of the seats in Philadelphia. Now that US Airways has merged with American, the combined airline has 77 percent of the seats. Airfare has gone from 4 percent below average to 10 percent above it.

— Delta's hold on Atlanta, the world's busiest airport, increased during that same period from 78 percent of seats to just over 80 percent. At the same time, low-cost AirTran merged into Southwest and reduced flights there. Domestic airfares at the airport went from nearly 6 percent below average to 11 percent above.

— Some cities are actually seeing lower fares than they did a decade ago. Prices in Denver were once 5.6 percent higher than the national average. Now that United's market share there has dropped to 41 percent from 56 percent, fares are almost 15 percent lower than the rest of the country.
Recent deals indicate the big airlines intend to stick to a strategy of dominating one airport and forgoing marginal service elsewhere.

For instance, United announced in June that it will abandon Kennedy Airport and move its dwindling number of JFK flights to New Jersey's Newark airport, where it already controls 68 percent of the seats. At the same time, if regulators go along, Delta will further shrink its small presence at Newark and take over United's share at JFK, where Delta is already top dog.[2]

36.    The concentrated structure of the United States air passenger industry is matched by the concentrated number of major of investors in the major passenger airlines. This is reflected in the following chart from BloombergBusiness:[3]

---

[2] http://bigstory.ap.org/article/7f964b3e484d4b43b732424dd9df0975/airlines-carve-us-markets-dominated-1-or-2-carriers.

[3] http://www.bloomberg.com/news/articles/2015-09-22/do-airfares-rise-when-carriers-have-same-investors-u-s-asks



37.     The academic literature supports the conclusion that such cross-ownership of airlines can lead to higher airfares. In April of 2015, The Ross School of Business at the University of Michigan released a study by Jose Azar, Martin C. Schmalz ("Schmalz") and Isabel Tecu entitled "Anti-Competitive Effects of Common Ownership" [4] ("Azar-Schmalz-Tecu Study"). It focused on common ownership in the airline industry, looking at the impact of BlackRock's acquisition of Barclays Global Investors ("BGI") in 2009 (BGI also had significant investment positions in domestic air passenger carriers). The study found that such common ownership translated to 3%-11% higher ticket prices. While Schmalz had no evidence to offer of actual collusion, he gave two possible reasons for this correlation:

> There are two possible explanations, Schmalz said.
>
> The first is that airline executives may hold back from aggressive competition -- expanding capacity, for example, or lowering prices -- because they know it's not in the interests of their biggest shareholders, which also own stakes in their competitors, he said.
>
> A second possibility: Executives could in theory coordinate moves on pricing or capacity by communicating strategy through discussions with large investors, Schmalz said. [5]

---

[4] http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2427345.

[5] http://www.bloomberg.com/news/articles/2015-09-22/do-airfares-rise-when-carriers-have-same-investors-u-s-asks.

38.     The same article notes that this study was presented to the DOJ. A 2015 article by Einar Elhauge  entitled "Horizontal Shareholding"[6] makes the similar point that when a common set of investors own significant shares in companies that compete with each other in a concentrated market, anticompetitive price increases are likely to occur.

### C.  The Conspiracy

#### a.  CAPACITY AND PRICING IN THE INDUSTRY PRIOR TO 2009

39.     In enacting the Airline Deregulation Act of 1978, Congress "plac[ed] maximum reliance on competitive market forces and on actual and potential competition" in the air transportation industry. 49 U.S.C. §40101 (a)(6). For decades, that purpose was largely served; there were recurring price wars over domestic air passenger fares, constant increases in airline capacity (as measured by available seat miles), and vigorous price competition.[7]

40.     IATA, to which American, Delta and United all belong, preached the gospel of capacity discipline. As early as September of 2003, told the members of IATA in Montreal that "[c]apacity control is also a key issue" and that "[t]oo often in the past, our industry has been focused on market share at the expense of profitability."[8] Bisignani repeated this theme in a 2006 speech delivered in Paris: "[l]et's start at home. Sometimes we have been our own worst enemy—chasing growth instead of profitability. As discussed, we changed after 2001. But let's be frank. We are now benefiting from a strong global economy. And record aircraft orders could be our Achilles heel *if we stop managing capacity carefully.*" (Emphases

---

[6] http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2632024.
[7] The price competition that occurred is documented in the economic literature. *See, e.g.,* Megan Busse, "Firm financial condition and airline price," 33 RAND J. of Econ. 298 (Summer 2002) (http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.164.6100&rep=rep1&type=pdf); Steven Morrison & Clifford Winston, "Causes and Consequences of Airline Fare Wars" (1996) (http://www.brookings.edu/~/media/Projects/BPEA/1996-micro/1996_bpeamicro_morrison.PDF).
[8] http://www.iata.org/pressroom/speeches/Pages/2003-09-09-02.aspx.

added).[9] Similarly, Bisignani said in a June 2010 speech delivered in Berlin that one of the risks facing the industry was "excess capacity"; "[t]he discipline of chasing profits, not market share, is the only way to protect the bottom line."[10]

41.     As noted above, the DOJ had indicated that some reduction in capacity had accompanied the merger of America West and US Airways in 2005 and the merger of Delta and Northwest Airlines in 2008. After the economic crash of 2008, the members of the industry became very receptive to the message of "capacity discipline". When the economy improved in 2009, the question arose whether the industry would return to its former ways of adding airline capacity and decreasing fares. The members of the industry made a conscious, joint decision not to do so.

<strong>"CAPACITY DISCIPLINE" DURING 2009-15</strong>

42.     Consensual capacity reduction among United States airlines commenced in 2009, when the industry as a whole reduced airline capacity by 10%.[11]

43.     The industry's new approach was reflected in statements made at the Bank of America Merrill Lynch Investment Conference in mid-2010, around the time that United and Continental Airlines announced their merger. The following article describes some of those statements:

> *The consensus among airline executives is that the industry will exercise "capacity discipline" by resisting the temptation to re-insert seats in markets that show strengthening demand.* Should the industry exhibit such behavior, it likely would mean more crowded airplanes and could provide carriers the impetus to raise fares and an opportunity to take another run at sustained profitability.
>
> "The No. 1 question I get from investors is, 'Is it different this time, or is the industry going to do what it has always done in the past and start growing again?' " said US Airways president Scott Kirby, speaking this week at a Bank of America investment conference. "I think it is different this time-- and I know you should always be careful when saying that because any time you say that about anything it's rarely different--but it feels different this

---

[9] http://www.iata.org/pressroom/speeches/Pages/2006-06-05-01.aspx.
[10] http://www.iata.org/pressroom/speeches/Pages/2010-06-07-01.aspx.
[11] http://www.fundatia-aleg.ro/module-pagesetter-viewpub-tid-28-pid-4338.phtml.

time for good rational reasons."

Most importantly, Kirby said, is that the entire industry--including low-cost carriers--"recognizes that we are a mature industry. This isn't a growth industry any more. It's hard to rationalize all the capacity that exists today, and it's even harder to rationalize new capacity on a going-forward basis. It is hard to justify buying new airplanes when you know that fuel could go back to $150 a barrel.

*"The industry, by and large, has CEOs with different views than the CEOs of yesteryear," Kirby continued. "They are much more focused on returns and financial performance than they are on empire building, 'how big is my airline, what is my market share, how many cities do I fly to,' etc. Things can change in a hurry, but I don't think rapid capacity growth is going to become a problem in this industry, at least for the foreseeable future."*

Speaking at the same conference, Delta Air Lines president Ed Bastian also cited capacity discipline, volatile fuel prices and management focus on shareholder value. "You have companies that have gone through the bankruptcy process and are highly sensitized to generating and delivering the kind of return that is required," he said. *Bastian also predicted that industry consolidation would progress, "allowing us to manage the overall capacity levels in a better way. You'll see the alliances deliver that same discipline from an international standpoint."*

American Airlines CEO Gerard Arpey agreed that the proposed United-Continental merger "will allow for one fewer choice in the marketplace and should contribute to a more rational balance between supply and demand.

"If we assume the current economic recovery has legs, then I think as an industry we are much better positioned to leverage the upturn than we have been in previous recoveries," Arpey continued. "There are far fewer seats for sale in the marketplace today than there were five years ago. There are also hopeful signs that the industry has learned its lesson about keeping capacity growth in line with demand--and will continue to apply that lesson even as the economy comes back."

Last month, J.P. Morgan analysts expressed sentiments similar to those shared this week by airline leaders. "Management composition appears stronger to us today than at any time in the past," they wrote in a May 25 research note. "No former heads of Boeing's 737 and 757 programs are running U.S. airlines, ordering aircraft. No airline is majority-owned by labor and run primarily for its benefit. The nation's largest discounter [Southwest Airlines] appears more interested in margin than market share, having ceased growth for the first time in its history. *While always dangerous to proclaim 'It's different this time,' the fact of the matter is that,*

*by all fundamental measures, it appears to us to be true."*[12] (Emphases added).

44. Thus, the leaders of the industry indicated they were braking away from past competitive practices and were entering a new era of "capacity discipline", a new era that they predicted confidently would continue. This certainty had to be based on an underlying agreement among the major United States airlines.

45. It did continue. In September of 2011, various airline executives spoke at a Deutsche Bank conference about what had happened in that year and what would happen in 2012. The *Wall Street Journal* reported on what was said:

> Speaking at a Deutsche Bank investor conference, airline executives provided the first guidance that capacity cuts already planned for the fall would continue into next year.
>
> Ed Bastian, the president of Delta, the second-largest airline by traffic, said the airline will extend its planned 4% to 5% fourth-quarter cut in capacity into the first quarter of 2012. The airline plans to cut capacity by 2% to 3% for all of 2012, compared with 2011.
>
> Jeff Smisek, United's chairman and chief executive, said the carrier next year will keep consolidated capacity, which includes its mainline flights and those outsourced to regional partners, in line with 2011 levels. The largest U.S. carrier by traffic plans to offset a "modest decrease" in domestic traffic next year with an increase in international flying, Mr. Smisek said, boosted by the expected arrival of the first six of its delayed Boeing Co. BA 3.63 % 787 Dreamliners.
>
> At the event, Southwest Chief Financial Officer Laura Wright said the airline, the largest carrier of domestic passengers, would keep capacity flat "or slightly down" next year.
>
> Meanwhile, Beverly Goulet, vice president and treasurer of American Airlines parent AMR Corp., said American will reduce its fourth-quarter capacity this year an additional 0.5%. American is taking "a very close look" at its capacity plans for 2012, she added.[13]

---

[12] *Id.*

[13] http://www.wsj.com/articles/SB10001424053111903532804576568922672945908.

46.     The approach led to higher airfares and fewer seats. As *Forbes* noted in a June 2014 article:

In the following years [after 2009], even as the demand environment improved, network airlines did not add significant capacity. Delta Airlines for instance, raised its capacity by only 1% during 2009-2013. United lowered its flying capacity from 253 billion miles in 2011 to 245 billion miles in 2013. American also did not add significant flying capacity to its network during this period. As these large airlines maintained steady flying capacity even as demand for air travel rose driven by economic recovery, overall industry air fares increased. This is also highlighted by data from the Bureau of Transportation Statistics which shows that average round-trip air fares in current dollars increased by 17% during 2007-2013…. The capacity discipline was so retained that even today the overall flying capacity in the domestic U.S. air travel market is below its pre-recession level. The total available seat miles in the domestic air travel market were 693 billion miles in 2013, down from 744 billion miles in 2007.[14]

47.     At the beginning of 2015, the industry's vigorous application of "capacity discipline" was unabated. A January 2015 article from *Air Transport World* described what occurred in 2014 and the airline executives' commitment to continue "capacity reduction" this year:

Huge profits. Low fuel prices. Strong demand. In the past, those factors would likely have led major US airlines to ramp up capacity…but no longer. The US's three global full-service airlines—Delta Air Lines, United Airlines and American Airlines—have all vowed to maintain strict capacity discipline.

United and American both plan to stay below 3% capacity growth in 2015. Delta has not provided full-year capacity guidance (though president Ed Bastian has said domestic capacity will probably grow "somewhere in the 2% to 3% range"), but has said its March quarter capacity will rise just 3% schedule-over-schedule (factoring in all of last year's winter storm-related cancelations, Delta's first-quarter capacity could rise as much as 5%). That follows low growth in 2014, a year in which all three airlines stayed below 3% year-over-year capacity expansion (United 0.5%, American 2.4% and Delta 3%).

"We are not making any changes to our 2015 capacity plan in light of the lower fuel prices," Delta CEO Richard Anderson told analysts and reporters last week when discussing the carrier's 2014 earnings. "In fact, we continue to trim capacity on the margin to maintain yields and our

---

[14] http://www.forbes.com/sites/greatspeculations/2014/06/20/airline-industry-will-have-to-maintain-capacity-discipline-to-remain-profitable/.

RASM premium."

Similarly, United chairman, president and CEO Jeff Smisek told analysts and reporters last week, "We're going to run the airline for profit maximization and we're very focused on capacity discipline … We will absolutely not lose our capacity discipline." United plans to grow capacity no more than 2.5% this year.

American plans to increase 2015 capacity 3% year-over-year domestically and 1.5% internationally. CFO Derek Kerr said this week, "You won't see any changes from us in the near future" on the capacity plan.[15]

48.     AAI in the aforementioned letter to DOJ noted that the domestic load factor for the Big Four airlines was 76% in 2004 and 86% in 2014.[16] The "capacity discipline" strategy served this goal. As the AIA remarked, "a CEO that says he or she will hold capacity increases to 2%, so long as others do, has potentially solicited collusive behavior, The conditionality of such a capacity strategy also exceeds the bounds of normal business behavior."[17]

49.     This industrywide strategy paid off handsomely for the market leaders, as reflected in the following chart published in Bloomberg Business:[18]

---

[15] http://m.atwonline.com/blog/maintaining-capacity-discipline.

[16] http://www.antitrustinstitute.org/sites/default/files/Letter%20to%20DOJ_Collusion%20Probe_F.pdf.

[17] *Id.*

[18] http://www.bloomberg.com/news/articles/2015-07-16/what-does-it-take-to-prove-airline-collusion-



50.     These developments made the leadership of IATA very happy. In February of 2011, an IATA press release noted with respect to North American air transportation carriers, that "[a] key feature in 2010 was the capacity discipline…."[19] Similarly, in June of 2013, Tony Tyler, the Executive Director of IATA who succeeded Bisignani, noted in a speech delivered in Cape Town that airline profits were coming from better use of capacity, citing an industry load factor[20] of "80.3%, which is an increase of ten percentage points over the last decade."[21] And an IATA analysis published in June of 2015 (in conjunction with the General Meeting referenced below) on the "Economic Performance of the Airline Industry" noted approvingly that the profitability of the United States airlines had increased the most, saying "US airlines consolidated after the global financial crisis and have been very disciplined about

---

[19] http://www.iata.org/pressroom/pr/Pages/2011-02-02-01.aspx.

[20] As explained on American's website, in the airline industry, the "load factor" consists of system-wide revenue passenger miles (a paying passenger flying one mile creates a revenue passenger mile) divided by available seat miles (one seat (empty or filled) flying one mile creates an available seat mile). http://www.aa.com/i18n/amrcorp/corporateInformation/facts/measurements.jsp.

[21] http://www.iata.org/pressroom/speeches/Pages/2013-06-03-02.aspx.

adding capacity."[22]

51.     The Defendants' position on capacity has been disseminated by the organization Airlines for America, a trade group to which they all belong and which provides a convenient forum for discussion of both the industry position on capacity and on other topics, such as common bag check fees or reservation cancellation charges.

a.   **Capacity Restrictions**

52.     In a collusive effort to raise prices and reap unprecedented profits, Defendants agreed to exercise capacity discipline.  A June 11, 2015 *New York Times* article by James B. Stewart explained that "'[d]iscipline' is classic oligopoly-speak for limiting flights and seats, higher prices and fatter profit margins. This year, that discipline seems to be working: the I.A.T.A. projected this week that airline industry profits would more than double this year to nearly $30 billion, a record." The same article noted: "When airline industry leaders say they're going to be 'disciplined,' they mean they don't want anyone to expand capacity."

53.     This discipline has led to increasing profit margins for Defendants. For example, American reported net income excluding net special charges of $4.2 billion in 2014 – up 115% from the prior year. United reported net income of $1.132 billion in 2014 – up from $571 million in 2013. Similarly, Delta's January 20, 2015 announcement of its December 2014 quarter financial results reported "a 70 percent increase in profits."  Southwest also reported increased income in 2014, stating in its 2014 Annual Report to Shareholders, "Our 2014 net income of $1.1 billion easily surpassed the previous annual record in 2013."

54.     Although, as IATA has reported, there is "strong demand growth" for domestic passenger air travel, airlines have refused to meet the demand with increased capacity, driving up the prices of domestic airline tickets.

---

[22] http://www.iata.org/whatwedo/Documents/economics/Economic-Performance-of-the-Airline-Industry-mid-year-2015-forecast-slides.pdf. By comparison, as noted by IATA, other markets are fragmented; the top four airlines in Europe have only a collective 36% market share



55.    Capacity reductions can be tied to recent consolidation within the industry. As detailed herein, the market is highly concentrated with, at present, only four major carriers that control 80% of the market.  As the DOJ has explained, significant mergers in the industry have been followed by capacity reductions: "[t]hese capacity reductions have not consisted simply of cancellation of empty planes or empty seats; rather, when airlines have cut capacity after a merger, the number of passengers they carry on the affected routes also decreased."

56.    As reported by the *New York Times*, Dr. Fiona Scott Morton said that "'on most airline routes, consumers have very little choice.' She noted that only since the recent wave of consolidation among airlines have they been able to set prices significantly above marginal cost. 'That's great for the industry but not for consumers....'"

57.    Schumer has expressed his concerns on this point, saying:

With high ticket prices, additional fees and limited carriers, we must ensure airlines aren't taking further steps to prevent consumers from comparison shopping. That's why, in light of the recent Justice Department probe into possible airline collusion, I am urging the feds to step up their efforts and do a full investigation into this new deceiving practice that limits access to cheaper, more affordable airfares for consumers. So many consumers rely on bargain hunting when purchasing flights and this practice makes it almost

impossible by restricting transparency and limiting competition among airlines….Freezing out websites that save travelers money on airfare is just plain wrong and the feds should include this practice in their investigation immediately.[23]

58.     A single airline does not have an independent interest in capacity discipline. If a single airline limited its capacity and raised its prices, its customers would simply turn to another airline. Thus, the "disciplined" airline would lose market share and sustain losses. However, if the four major airlines (which, together, control 80% of the domestic passenger air travel market) coordinate to engage in capacity discipline and increase prices, consumers will be forced to either pay the higher prices or possibly forego air travel altogether.

59.     As previously noted, one airline would not choose to exercise capacity discipline absent assurances from others that they too would choose to be disciplined. In order to exchange such assurances, Defendants often communicated to one another their intention to remain disciplined.

60.     For example, when discussing United's 2014 $2 billion in profits, United's then-CEO, Jeff Smisek, said "[w]e will absolutely not lose our capacity discipline.... It's very healthy for us and very healthy for the industry."  Mr. Smisek resigned as United's chairman, president and CEO on September 8, 2015, effectively immediately, as did the company's executive vice president of communications and government affairs and its senior vice president of corporate and government affairs.  The Company has publicly reported that the resignations were related to a corruption investigation involving adding flights in exchange for the Port Authority of New Jersey's approval of and funding for certain projects, including a $600 million extension of a PATH train. Former CEO Smisek was reportedly personally involved in such negotiations.  Bloomberg News has reported that "there may have been a direct link" between such requests that "raise the possibility of bribery or extortion."

---

[23] http://www.schumer.senate.gov/newsroom/press-releases/schumer-reveals-in-move-that-could-cost-travelers-6-billion-more-a-year-airlines-are-working-to-prevent-consumers-from-shopping-around-for-best-flight-price-by-refusing-to-share-flight-info-with-websites-like-expedia-orbitz-tripadvisor-and-others-senator-pushes-feds-to-investigate-new-airline-policyon-top-of-current-collusion-investigation.

61.     With respect to "capacity discipline," Delta's CEO, Richard Anderson, delivered a similar message: "As we begin 2015, we have a significant opportunity from lower fuel prices, which will drive more than $2 billion in fuel savings over 2014. Through our capacity discipline, pricing our product to demand, and the fuel savings, we expect to drive double-digit earnings growth, along with increased free cash flow and a higher return on invested capital in the upcoming year." Anderson also added that "[w]e are not making any changes to our 2015 capacity plan in light of the lower fuel prices. In fact, we continue to trim capacity on the margin to maintain yields...."

62.     In support of the cartel, American rolled back a previously announced pre-merger plan to add both domestic and international routes. In March 2015, Scott Kirby (American's President) confirmed at an investor conference that American would not be following the previously announced plan to add domestic and international routes. Specifically, Kirby said that "[a]lmost all of our capacity growth domestically is about putting more seats on airplanes," not adding airplanes. Kirby explained:

> It's distinct from capacity where we're adding new airplanes, growth aircraft. We really aren't. We expect to end 2015 with fewer aircraft at the end of the year than we started the year, but we'll still have capacity growth because we have more seats on each of the aircraft....All airlines for the most part are putting more seats on airplanes. We're doing it. United's doing it. Delta's doing it. Even Southwest is continuing to put more seats on their existing aircraft. Once you've done that, you're done.

63.     Due to growing demand (as reported by IATA), adding a limited number of seats allows Defendants to continue to fill existing aircraft at higher prices without having to incur the expense (including additional fuel, crews, gates, etc.) of adding new aircraft.

64.     In order to maintain the cartel, Defendants monitored one another and policed their shared commitment to capacity discipline. One recent example of such monitoring and policing involved Southwest's announcement of a planned capacity expansion, followed shortly by its recantation. On May 20, 2015, Gary C. Kelly, the CEO of Defendant Southwest, announced that Southwest would increase its capacity by as much as eight percent by acquiring two new gates at its hub at Love Field in Dallas, TX.

65.     As a result of Southwest's announcement, the stock prices of the other Defendant airlines plummeted. Industry stock analysts, including one from Raymond James, explained that investors were reacting to the perceived "end of the era of capacity discipline."

66.     The industry's reaction to this announced break in "capacity discipline" was swift and direct. At the June 7-9, 2015 IATA Annual General Meeting held in Miami, Florida, several industry executives in attendance voiced the continued need for the industry to remain disciplined with respect to capacity growth. For example, Ed Bastian (Delta's President), said that Delta is "continuing with the discipline that the marketplace is expecting." Douglas Parker (American's CEO) echoed those remarks, stating that the airlines had learned their lessons from past costly capacity additions: "I think everyone in the industry understands that."

67.     Southwest heard the messages of its competitors and responded accordingly. Within a matter of days, Southwest had relented to the pressure and fallen in line. The June 11, 2015 *New York Times* article by James B. Stewart explained that "after coming under fire at this week's conference, Southwest quickly moved to reassure investors it isn't going rogue," announcing "'[w]e have taken steps this week to begin pulling down our second half of 2015 to manage our 2015 capacity growth....'" Thus, it is clear that Defendants actively monitor and police the cartel.

68.     On June 17, 2015, United States Senator Richard Blumenthal ("Senator Blumenthal") wrote a letter to United States Assistant Attorney General William Baer, encouraging an investigation into the industry's actions. With respect to Southwest's revisions to its announced plan to increase capacity, Senator Blumenthal stated that "[t]he conclusion seems inescapable that the remarks made at the IATA conference were targeted at Southwest, and that its capitulation was the result of the 'fire' aimed at the company."

69.     Senator Blumenthal wrote:

Recently, the International Air Transport Association (IATA) brought together the top executives of the world's largest airlines at its annual meeting in Miami, Florida. The New York Times reported that at this meeting many of these competitors publicly discussed their strategies to remain "disciplined" in their decisions to manage capacity across their flight

routes.[] As you know from the Department of Justice's (DOJ's) investigation into US Airways' merger with American Airlines in 2013, most airlines have traditionally viewed capacity reductions as a highly valuable way to artificially raise fares and boost profit margins. In light of the recent unprecedented level of consolidation in the airline industry, this public display of strategic coordination is highly troubling.

Therefore, I urge the Justice Department to investigate this apparent anti-competitive conduct potentially reflecting a misuse of market power, and excessive consolidation in the airline industry. DOJ itself played a part in this consolidation by approving several mergers and now consumers are paying sky-high fares as airlines engage in market conduct designed to keep capacity artificially low.

***

In August 2013, the Justice Department filed an antitrust lawsuit to block the proposed merger between US Airways and American Airlines.[] A few months later, DOJ settled that case and allowed the merger to proceed subject to a number of gate divestitures. As a result of that merger, just four major airlines now account for eighty percent of all domestic air travel.

DOJ's original complaint painted a stark picture of an extremely consolidated market, in which few firms wield enormous market power to the detriment of consumers and competition – and in which high-level executive [sic] believe there is an unmistakable link between fluctuations in capacity and fares [sic] hikes. During the course of the Antitrust Division's review of the American Airlines / US Airways merger, your staff studied the internal analyses and the planning documents put together by both companies in considering the likely effects of the merger. During DOJ's original announcement rejecting the merger you stated, "High level executives at US Airways have talked about how consolidation allows for capacity reductions that 'enable' fare increases."[]

In particular, DOJ's complaint provided evidence of past behavior by US Airways to punish a rival for its reducing fares; it also alleged that the merger would reduce capacity and growth across the industry; and result in increased coordinated interaction among the remaining legacy airlines.

The Complaint specifically documents the troubling history of US Airways communicating directly to a rival airline that it was upset by that airline's efforts to compete more aggressively. In 2010, senior executives at US Airways complained that competition from the rival airline was "hurting profitability" in the industry. DOJ wrote: "[S]enior management debated over email about how best to get the rival airline's attention and bring it back in line with the rest of the industry. . . .[The CEO] urged the other executives to, 'portray these guys as idiots to Wall Street and anyone who'll listen.'"[]

The Justice Department also correctly predicted that this kind of behavior would continue should the merger be allowed to proceed – as it ultimately was. In the original complaint, DOJ wrote, "The structure of the airline industry is already conducive to coordinated behavior...the legacy airlines closely watch the pricing moves of their competitors. When

one airline 'leads' a price increase, other airlines frequently respond by following with price increases of their own."[]

To bring home the point, the Complaint follows, "Coordination becomes easier as the number of major airlines dwindles and their business models converge."[]

I agree. I therefore urge the Antitrust Division to conduct a full and thorough investigation of anticompetitive, anti-consumer conduct and misuse of market power in the airline industry, evidenced by recent pricing patterns as well as remarks made at the IATA conference. Consumers are paying sky-high fares and are trapped in an uncompetitive market with a history of collusive behavior. If you find that these comments were coordinated to punish Southwest Airlines' announcement of capacity increases, I urge you to use all the tools at your disposal to punish this anti-competitive and anti-consumer behavior.

70.     On June 30, 2015, the DOJ launched an investigation, sending civil investigative demands ("CIDs") to Defendants. A spokesperson for the DOJ, Emily Pierce, confirmed the DOJ's investigation, saying the Department was investigating "possible unlawful coordination" to limit capacity increases and raise, fix, stabilize, or maintain prices. The Defendants confirmed receipt of the DOJ's CIDs.

71.     This was not a minor matter. The *Antitrust Division Manual* states that CIDs may be served on suspected violators if "there is 'reason to believe' that any violation within the Division's scope of authority has occurred." *See* United States Department of Justice, *Antitrust Division Manual*, at III-45 (5th ed. April 2015).[24] As Gene Kimmelman, a former official in the Antitrust Division, has noted, "[t]he Justice Department doesn't just launch investigations as fishing expeditions…. There's a keen awareness that when they request documents, there's a significant cost to companies, it's not easy and there are a lot of expenditures. . . . They have to have a strong reason to believe there may be a violation of law."[25]

72.     The Associated Press obtained a copy of the CID. Specifically, the Associated Press reported:

---

[24] http://www.justice.gov/sites/default/files/atr/legacy/2015/05/13/atrdivman.pdf.

[25] http://www.washingtonpost.com/business/economy/doj-investigating-potential-airline-collusion/2015/07/01/42d99102-201c-11e5-aeb9-a411a84c9d55_story.html.

We have a copy of the "civil investigative demand for documents and information" that seeks this type of information:

- Tell us who in your company sets the communications strategy to shareholders, investors or analysts and who does that communication.

- Give us any documents "discuss[ing] (a) the need for, or the desirability of, capacity reductions or growth limitations by the company or any other airline; or (b) the undesirability of your company or any other airline increasing capacity."

- Give us any documents that talk about changes in your capacity or that of your competitors.

- Give us any communications between you and outside parties about your capacity or that of your competitors and how capacity changes affect fares, revenues or profits.

- Tell us the time and place of any conference, meeting or appointment, including telephone calls, you have involving industry analysts (we want your appointment books, day planners, calendars, etc., as well as any materials preparing for such contacts).

- We want to know everybody who owns at least 2 percent of your company, including the time that person owned that much of your company.

- Concerning those people who owned at least 2 percent, tell us about all your meetings, appointments or conference with those people in which industry capacity was discussed. We want to see any calendars, appointment books, day planners, etc., that were involved, as well as any documents prepared for those discussions and which talked about those discussions afterward.

- We want to know how much capacity you flew, in available seat miles, every month since January 2010, and please include the seat miles flown by your regional partners as well.

- Spell out your document retention policy including emails.

- Tell us who is preparing this information and submitting it to us. If someone gives that preparer some oral instructions, tell us who gave the oral instructions and what he and she said.

73.     On the following day, George Jepsen, the Attorney General of the State of Connecticut, announced his office's investigation into collusive activity in the domestic airline industry. Jepsen also announced that his office had sent letters to American, Delta, Southwest and United.

74.     The Business Travelers Coalition ("BTC") applauded the initiation of the DOJ investigation. As reported in a July 2, 2015 article in eTurbonews:

> "The number one concern that antitrust experts have – with no close second – as with regard to radical consolidation of any industry, is the risk of tacit competitor coordination on policies, practices and prices among a reduced number of industry participants," stated BTC chairman Kevin Mitchell. "Since recent U.S. airline mega-mergers, we have witnessed near constant airline CEO calls for 'capacity discipline' during industry gatherings and analyst earnings calls only to be echoed by analysts in follow-on earning calls with other airlines. This represents perhaps the darkest hours of airline coordination as well as a too-cozy harmonization between airlines and Wall Street," added Mitchell.

75.     In a September 22, 2015 letter from the American Antitrust Institute ("AAI") to the DOJ,[26] the AAI also expressed serious concerns about the Defendants' possible collusive imposition of ancillary fees (and their potential coordination through IATA on such matters), as well as their efforts to limit data available to online travel services.[27]

76.     In response to the DOJ's action, Senator Blumenthal encouraged it to "be tireless and timely to save consumers from the onslaught of price increases in summer fares that may result from collusive and anticompetitive airline company misconduct."

77.     United States Senator Charles E. Schumer ("Senator Schumer") also praised the DOJ's response, stating that "[i]t's hard to understand, with jet fuel prices dropping by 40 percent since last year, why ticket prices haven't followed. We know when airlines merge, there's less price competition."

### b.  High Airline Ticket Prices Are Not Explained By Market Forces

78.     The market trend of increasing airline ticket prices is not explained by market forces. For example, during the time that airfares were steadily climbing, the cost of jet fuel was falling dramatically.

---

[26] http://www.antitrustinstitute.org/sites/default/files/Letter%20to%20DOJ_Collusion%20Probe_F.pdf.

[27] http://www.antitrustinstitute.org/sites/default/files/Letter%20to%20DOJ_Collusion%20Probe_F.pdf.



79.     As Senator Schumer explained in December 2014, "when the cost of fuel is plummeting and profits are rising, it is curious and confounding that ticket prices are sky-high and defying economic gravity....The industry often raises prices in a flash when oil prices spike, yet they appear not to be adjusting for the historic decline in the cost of fuel; ticket prices should not shoot up like a rocket and come down like a feather...."

80.     One reason for the high profits in 2015 has been the declining cost of jet fuel. It has been estimated that in April of 2015, United States airlines paid $1.94 a gallon for jet fuel, a decrease of 34 percent from the previous year. One would expect that in a competitive industry, airfares would decrease as a result, while airlines sought to obtain greater market shares. That has not happened. Delta CEO Richard Anderson was candid about his company's exploitation of the free fall in jet fuel prices:

> It's wonderful that fuel has run down–we love it. There's a $2 billion opportunity out there if we hold fare levels constant. But over the very long-term horizon, it's just more conservative and prudent to use a high fuel assumption when you're buying airplanes or making other investments, and

then when it comes in lower, hang on to all of it.[28]

81.     "The idea that U.S. airlines would, once again, devolve into a war for market share is founded on a misunderstanding of the new structure of U.S. airlines," Vinay Bhaskara, an industry analyst, wrote in *Airways News*.[29] He added that "[r]emember, this is the same management group that (instead of allowing passengers to reap a modest reduction in fares) responded to the F.A.A.'s inability to collect taxes in mid-2011 by gleefully raising base fares to where total out-of-pocket costs were exactly the same (earning a windfall of $28.5 million per day)."[30] United States Senator Charles E. Schumer ("Schumer") has echoed this point, stating in December of 2014 that "[a]t a time when the cost of fuel is plummeting and profits are rising, it is curious and confounding that ticket prices are sky-high and defying economic gravity....The industry often raises prices in a flash when oil prices spike, yet they appear not to be adjusting for the historic decline in the cost of fuel; ticket prices should not shoot up like a rocket and come down like a feather." [31]

### c.   The Airlines Coordinate to Decrease Price Transparency for Consumers

82.     In addition to coordinating to limit capacity, Defendants also coordinate to limit price transparency to the detriment of the American consumer. An article by the BTC noted that, in addition to the airlines' "tacit coordination on capacity," the airlines engaged in an "even more aggressive and widely coordinated attack on price transparency, consumer protections and competition." Specifically, as noted by the BTC:

---

[28] http://qz.com/324981/the-airline-executives-standing-between-you-and-cheap-plane-tickets/.

[29] http://www.nytimes.com/2015/03/24/business/dealbook/as-oil-prices-fall-air-fares-still-stay-high.html.

[30] *Id*.

[31] *Id*.

## ANCILLARY FEE DATA

Since 2008, the Big Three U.S. airlines (Delta Air Lines, American Airlines, United Airlines) have rejected their most valued corporate customers' demands for ancillary fee data that would enable their business travelers to efficiently see, compare and buy ancillary services (e.g., checked bags, preferred seats) in the same transaction as the base airfare. Leisure travelers must navigate airline websites in search of best airfare and ancillary fee combinations often paying higher prices than necessary. In total, this opacity results in these ancillary fees not being disciplined by market forces. Likewise, there is great profit in consumer confusion.

## PASSENGER FACILITY FEES

Airports use PFC's to add gates and other facilities to attract additional airlines to compete for local travelers' business expanding consumer choice and disciplining incumbent airlines' prices. The Big Three seem to not want new competition.

****

## NORWEGIAN AIR INTERNATIONAL'S (NAI) APPLICATION

Under the EU-US Open Skies agreement, NAI's application to serve the U.S. should have been a 5-week pro forma review and approval. Instead, airlines' political pressure has held up approval for 15 months. This is as embarrassing to the United States as it is outrageous in its harm to U.S. consumers. Airlines fear that if NAI's low-fare business model were to be embraced by U.S. consumers, other carriers like Ryanair and JetBlue would seek to emulate NAI's success.

## U.S. DOT CONSUMER PROTECTION AUTHORITY

The Big Three fought the Full Fare Advertising Rule promulgated in 2011 by DOT. When DOT implemented the rule to safeguard consumers' interest, the airlines sued DOT in federal district court and lost. They then went to the Supreme Court, which rejected their pleas. Airlines finally turned to the U.S. House of Representatives to pass the Orwellian named Transparent Airfares Act of 2014. The bill, luckily rejected by the Senate, would have increased airlines' revenues and profits by obscuring the true price of air travel options.

## PROTECTION FROM GULF CARRIER COMPETITION

The Big Three claim that the Gulf airlines – Emirates, Qatar and Etihad – receive government support that is harming the U.S. carriers. The Big Three co opted Congress again with a Congressional letter that supports the Big Three's call for a freeze in new air services by the Gulf airlines – all without having allowed those carriers an opportunity to respond to the allegations, not to mention the glaring hypocrisy that the U.S. airline industry, by the Big Three's very own math, has been the most heavily taxpayer subsidized and structurally advantaged in the history of commercial aviation. Brazenly, the airlines recently warned the Obama Administration that if they don't play ball, the Big Three will again seek Congressional legislative support.

83.     Like the BTC and AAI, the Travel Technology Association has voiced its concerns over Defendants' efforts to limit transparency. On May 19, 2015, it issued "Benefits of Preserving Consumers' Ability to Compare Airline Fares," a report prepared by Charles River Associates for the Travel Technology Association and authored by, among others, Dr. Fiona Scott Morton. The report explained that competition in the domestic airline industry had suffered because of the significant number of mergers of legacy carriers and efforts by the major airlines to discourage travelers from using online travel agencies ("OTAs") that make it easy for prospective travelers to compare fares of various airlines.

84.     The report found that:

- Restrictions by airlines of broad access to airline information – prices and schedules – substantially reduce consumer welfare. This study estimates the potential reduction in net consumer welfare of limiting airline price and schedule information to only airline websites could exceed $6 billion per year. Additionally, such restrictions may result in up to 41 million passengers annually choosing not to fly.

- In addition to offering independent price comparisons, OTAs and metasearch travel sites provide consumers with other travel information, such as suggestions for places to go and things to do. Supplementing airline schedule information with complementary information and products expands the market for air travel, further increasing consumer welfare.

- Airline markets are highly concentrated, with significant barriers to entry. The recent merger of American Airlines and US Airways has led to fare increases in affected city-pair markets that are about 4 percent higher than in non-affected markets. In certain city-pair markets in which the merger reduced the number of significant competitors from 3 to 2, or from 2 to 1, fare increases have been 7 to 17 percent. The welfare-enhancing impacts of broad access to airline fare and schedule information may be even larger in duopoly or monopoly city pairs.

- Airline profits globally are at an all-time high, expected to reach $25 billion for 2015.[] While airline fuel prices declined nearly 25 percent last year, average domestic airfares have remained flat while ancillary revenue of the major U.S. airlines grew to over $15 billion in 2014.[]

85.     The report also detailed certain Defendants' efforts to stifle metasearch sites, including:

- Prohibiting metasearch sites from referring consumers to an OTA for booking a flight.

- Prohibiting OTAs from providing airline information to metasearch sites.

- Prohibiting GDSs from providing airline price and schedule information to "unauthorized" metasearch sites.

- Prohibiting onward-distributing flight schedule information to metasearch sites by services such as Innovata.[]

- Refusing to pay metasearch sites for direct referrals to the airline's own booking website.

- Prohibiting metasearch sites from displaying price information of the airline.

86.     The report estimated that airlines earn approximately $30 more on each leisure and unmanaged business passenger when prices are not transparent.

87.     Despite the actions of the DOJ, some of the Defendants refuse to give up on "capacity discipline." Thus, on July 10, 2015, American announced that it was reducing its capacity plans for 2015 even further.[32]

88.     However, since the DOJ's investigation began, airfares have started to decline significantly, suggesting that Defendants are reacting explicitly to the governmental probe. This is reflected in the following chart from BloombergBusiness:[33]



**Probe Unfolds as Fares Decline**
Antitrust regulators weighed in amid a drop in ticket prices to the lowest since 2010

SOURCE: Airline Reporting Corp.

Bloomberg

---

[32] http://aviationblog.dallasnews.com/2015/07/american-airlines-cuts-2015-capacity-plans-a-bit.htm.

[33] http://www.bloomberg.com/news/articles/2015-09-22/do-airfares-rise-when-carriers-have-same-investors-u-s-asks

### D. **Market Characteristics Conducive to Collusion**

#### a. **The Airline Market is Susceptible to Collusion because it is Controlled by a Limited Number of Participants**

89.     The domestic airline industry is highly concentrated. In 2008, there were eight major carriers in the United States. Today, due to a series of mergers, there are just four. Together, Defendants control more than 80% of the market for domestic airline seats.

90.     The airline industry went from ten major domestic air passenger carriers to four within a decade. Specifically, in 2005 US Airways merged with America West. In 2008, Delta merged with Northwest Airlines. In 2010, United merged with Continental. In 2011, Southwest merged with AirTran. Finally, in 2013, American merged with US Airways. The American- US Airways merger resulted in the creation of the largest airline in the world.

91.     The DOJ initially opposed the merger of American and US Airways, filing an antitrust lawsuit against the two companies in August 2013. The DOJ's complaint, captioned *United States v. U.S. Airways Group, Inc.*, No. 1:13-cv-01236 (D.D.C.) ("2013 DOJ Complaint"), explained that the heavily consolidated market – which, at that time, was dominated by five major airlines (American, Delta, Southwest, US Airways and United) – allowed these airlines to use their market power to coordinate limitations on capacity while increasing airfares.

92.     The DOJ explained that the "structure of the airline industry is already conducive to coordinated behavior: Few large players dominate the industry; each transaction is small; and most pricing is readily transparent." 2013 DOJ Complaint at ¶ 41. Further market consolidation (*i.e.*, from the 5 dominant airlines that controlled the market then to the 4 dominant airlines that control the market now) "would [thus] make it easier for the remaining airlines to cooperate, rather than compete, on price and service." *Id.* at ¶ 3.

93.     In its complaint, the DOJ outlined examples of such coordinated behavior. These behaviors include: (1) competitors closely watching and copying each other's pricing increases; (2) using "cross-market initiatives," where one airline attempts to discourage discounting by its competitor by responding to the competitor's discount with its own discount in another market in which the competitor prefers a higher fare; and (3) direct communications between competitors designed to discourage or punish airlines that cause price wars. *Id.* at ¶¶ 42-45.

94.     The DOJ reached a settlement with American and US Airways that allowed the two airlines to merge. As part of the settlement, the airlines were forced to divest certain gates and slots at major airports in Washington D.C., New York, Los Angeles, Chicago, Boston, Dallas, and Miami.

95.     Increased consolidation – resulting in 80% of the market being controlled by only 4 airlines – has harmed airline passengers. As a result of this consolidation, coordination between the remaining carriers has become easier and Defendants have taken advantage of the opportunity to coordinate to set higher fares, impose new and higher fees on travelers, and reduce their capacity.

96.     Defendants' power to impose exorbitant prices on American consumers is also evidenced by a Department of Transportation investigation, announced July 24, 2015, regarding allegations that Defendants engaged in price gouging immediately following the deadly May 2015 Amtrak derailment in Philadelphia.

97.     This demonstrates another effect of the current market environment: identical airfares charged by ostensibly competing air passenger carriers. On July 2, 2015 an article published comparative airfares for various flights:

> For example, tickets for nonstop flights to five destinations served by two competing carriers from Charlotte Douglas International Airport in North Carolina are largely identical.
>
> – A round-trip economy class ticket from Charlotte to Chicago O'Hare, departing on Sept. 9 and returning Sept. 14, costs $252 on both United and American.

– An economy round-trip ticket from Charlotte to Houston
Intercontinental on those days costs $327 on those same two carriers.

– An economy round trip on American and Delta from Charlotte to Detroit
Metropolitan on those same days costs $350.

– A round-trip flight from Charlotte to New York's LaGuardia airport
costs $220 on American and Delta, while a round trip from Charlotte to
Newark Liberty on the same days costs $199 on American and United.[34]

98.     American, Delta, United and Southwest now control approximately 80% of the domestic
air passenger seats.  The average domestic airfare rose 13 percent from 2009 to 2014, according to data
from the federal Department of Transportation's Bureau of Transportation Statistics.[35] The following chart
from that agency's website shows fourth quarter 2014 average domestic air fares from 1995 to 2014:



Source: Bureau of Transportation Statistics, BTS Air Fares, Origin and Destination Survey

---

[34] http://www.mcclatchydc.com/news/nation-world/national/economy/article26083942.html.

[35] http://www.rita.dot.gov/bts/press_releases/bts021_15.

99.     AAI did its own analysis of fare increases in the aforementioned letter to DOJ.[36] It found that average real fares across airline hubs declined by 12% from 2004-09, even though fuel costs increased by 33% during the same period. All of that changed in the 2009-14 period:

> From 2009–2014, for example, the increase in average fares across hubs was 15%. This rate of growth far outstripped that of fuel costs, which slowed to less than 5% over the second period.
> Indeed, four of the five years from 2009–2014 were marked by flat or declining fuel costs for the Big 4. By 2014, operating margins had increased to 8.6% and the airlines were strongly profitable.20 This second period includes the three mergers of United-Continental, Southwest-AirTran, and US Airways-American. Significantly higher fares and slower rates of increase in fuel costs, and strong return to profitability marked this phase.[37]

100.     Southwest used to be regarded as a price-cutter in some regions. But under current market conditions, that is no longer true. An October 18, 2012 Associated Press article makes this point:

> While Southwest rolls out the occasional sale to fill planes -- they were 82.1 percent full, a record for the quarter -- it has also been aggressive about trying to raise fares in recent months.
>
> It launched two of the three fare increases that stuck during the quarter, according to a tally by Rick Seaney, CEO of air-travel website FareCompare.com.
>
> And when an attempted increase by United Airlines last week faltered, Southwest came along and revived it. Seaney wrote that it was the first time he remembers a low-cost airline reviving a failed domestic price hike in almost a decade of watching fares.[38]

---

[36] http://www.antitrustinstitute.org/sites/default/files/Letter%20to%20DOJ_Collusion%20Probe_F.pdf.

[37] *Id.*
[38] http://www.cleveland.com/business/index.ssf/2012/10/southwest_airlines_posts_small.html.

**b.   High Barriers to Entry in the Airline Market Make the Industry Susceptible to Collusion**

101.    Substantial barriers to entry exist in the market for domestic airline passenger service. Thus, new market entrants are unlikely to disrupt the stranglehold over the market possessed by Defendants.

102.    Barriers to entry include that the airline business is very capital-intensive. New market entrants would have to acquire *inter alia* airplanes, gates and runway slots. Moreover, the industry has historically suffered from lack of profitability.  New market entrants are also discouraged by high market concentration, *i.e.* that the market is dominated by a small number of carriers. According to the as measured by the Herfindahl-Hirschman Index, average market concentration in airline hubs from 2004-14, were from 3,400 to 3,750.[39] In a 2013 study noted that prior to and after the Delta-Northwest merger, 11% of airport pairs were eliminated from the merged entity's network; similar figures for the United-Continental and Southwest-AirTran mergers were 9% and 22%, respectively.[40] The toll has had an adverse impact on airports serving smaller cities.[41]

103.    The industry consolidation discussed above has allowed the dominant carriers to control a high percentage of the gates and runway slots at popular hubs, thus making it extremely difficult for any new carrier to obtain the gates and runway slots needed for day-to-day operation.

**c.   The Defendants had Many Opportunities to Collude**

104.    Defendants had many opportunities to collude. For example, industry executives attended trade association meetings, including meetings of the IATA (as detailed above). In addition to these opportunities to meet face to face, industry executives exchanged information through stock analysts and investor calls and may have communicated directly with one another by phone or email.

---

[39] http://www.antitrustinstitute.org/sites/default/files/Letter%20to%20DOJ_Collusion%20Probe_F.pdf.

[40] http://www.antitrustinstitute.org/sites/default/files/AAI_USAir-AA_Efficiencies.pdf.
[41] http://dspace.mit.edu/bitstream/handle/1721.1/90076/890141840-MIT.pdf?sequence=2

### d.  The Airline Industry's History of Collusive Behavior

105.    Airlines have engaged in express coordinated behavior in the past. In the 2013 DOJ

Complaint, the DOJ highlighted the fact that the "structure of the airline industry is already conducive to

coordinated behavior." 2013 DOJ Complaint at ¶ 41. For example, the airlines maintain close watch over

each other's fares and respond in kind to each other's fare increases.

106.    In 1992, airlines, including American and US Airways, were sued by the United States for

using the Airline Tariff Publishing Company ("ATPCO") to coordinate pricing. The ATPCO has been

described as a "dedicated price-telegraph network" for the airline industry. The DOJ explained in the 2013

DOJ Complaint that the airlines used the ATPCO "to monitor and analyze each other's fares and fare

changes and implement strategies designed to coordinate pricing."   2013 DOJ Complaint at ¶ 44.

Specifically, the 1992 lawsuit sought to stop the airlines from "using their ATPCO filings as a signaling

device to facilitate agreements on fares." *Id.* That lawsuit resulted in a consent decree, which has since

expired.

107.    The 2013 DOJ Complaint also detailed other instances of anticompetitive conduct between

airlines, including at least one instance of direct communication between competitors regarding pricing.

Specifically, the DOJ wrote:

> US Airways also has communicated directly with a competitor when it was upset by that
> competitor's efforts to compete more aggressively. In 2010, one of US Airways' larger
> rivals extended a "triple miles" promotion that set off a market share battle among legacy
> carriers. The rival airline was also expanding into new markets and was rumored to be
> returning planes to its fleet that had been mothballed during the recession. US Airways'
> CEO complained about these aggressive maneuvers, stating to his senior executives that
> such actions were "hurting [the rival airline's] profitability – and unfortunately everyone
> else's." US Airways' senior management debated over email about how best to get the rival
> airline's attention and bring it back in line with the rest of the industry. In that email thread,
> US Airways' CEO urged the other executives to "portray[] these guys as idiots to Wall
> Street and anyone else who'll listen." Ultimately, to make sure the message was received,
> US Airways' CEO forwarded the email chain – and its candid discussion about how
> aggressive competition would be bad for the industry – directly to the CEO of the rival
> airline. (The rival's CEO immediately responded that it was an inappropriate
> communication that he was referring to his general counsel.)

*Id.* at ¶ 45.

108.    Moreover, the airlines have used "cross-market initiatives" ("CMIs") to prevent price competition. As the DOJ explained:

> A CMI occurs where two or more airlines compete against each other on multiple routes. If an airline offers discounted fares in one market, an affected competitor often responds with discounts in another market – a CMI – where the discounting airline prefers a higher fare. CMIs often cause an airline to withdraw fare discounts.  *Id.* at ¶ 43.

109.    The DOJ further noted that "[i]n essence, industry consolidation has left fewer, more-similar airlines, making it easier for the remaining airlines to raise prices, impose new or higher baggage and other ancillary fees, and reduce capacity and service." It went on to note:

> Increasing consolidation among large airlines has hurt passengers. The major airlines have copied each other in raising fares, imposing new fees on travelers, reducing or eliminating service on a number of city pairs, and downgrading amenities. An August 2012 presentation from US Airways observes that consolidation has resulted in "Fewer and Larger Competitors." The structural change to "fewer and larger competitors" has allowed "[t]he industry" to "reap the benefits." Those benefits to the industry are touted by US Airways in the same presentation as including "capacity reductions" and new "ancillary revenues" like bag fees.

110.    The DOJ's complaint went on to discuss how the history of airline mergers had led to airline capacity reductions:

> Legacy airlines have taken advantage of increasing consolidation to exercise "capacity discipline." "Capacity discipline" has meant restraining growth or reducing established service. The planned merger would be a further step in that industry-wide effort. In theory, reducing unused capacity can be an efficient decision that allows a firm to reduce its costs, ultimately leading to lower consumer prices. In the airline industry, however, recent experience has shown that capacity discipline has resulted in fewer flights and higher fares.

> Each significant legacy airline merger in recent years has been followed by substantial reductions in service and capacity. These capacity reductions have not consisted simply of cancellation of empty planes or empty seats; rather, when airlines have cut capacity after a merger, the number of passengers they carry on the affected routes has also decreased.

> US Airways has recognized that it benefitted from this industry consolidation and

the resulting capacity discipline. US Airways has long taken the position that the capacity cuts achieved through capacity discipline "enabled" fare increases and that "pricing power" results from "reduced industry capacity." US Airways' CEO explained to investors in 2006 that there is an "inextricable link" between removing seats and raising fares.

In 2005, America West—managed then by many of the same executives who currently manage US Airways—merged with US Airways. America West had hubs in Phoenix and Las
Vegas while the former US Airways had hubs in Pittsburgh, Charlotte, and Philadelphia. Following the merger, the combined firm reduced capacity, including significant cuts in Pittsburgh and Las Vegas. In 2010, the Chief Financial Officer for US Airways explained:

We believe in the hub system. I just think there's too many hubs. If you look across the country, you can probably pick a few that are smaller hubs and maybe duplicative to other hubs that airlines have that they could probably get out of. In our example, we merged with US Airways [and] . . . what we have done over time, which is unfortunate for the cities, but we couldn't hold a hub in Pittsburgh and we couldn't hold a hub in Las Vegas. So over time we have consolidated and condensed our operation back, which is really important, condensed it back to our major hubs.

A post-merger US Airways analysis confirmed that it succeeded in obtaining a "3% to 4% capacity reduction."

In 2006, on the heels of the America West/US Airways merger, the combined firm submitted an ultimately unsuccessful hostile bid for Delta Air Lines. US Airways' management had concluded that a merged US Airways/Delta could reduce the combined carrier's capacity by 10 percent, which would lead to higher revenues for the combined firm and for the industry. In 2007, following the rejection of the hostile bid, US Airways' CEO explained to investors how the deal would have increased industry profits:

It's part of what we tried to impress upon people as we were going through our run at Delta, was that . . . it was good for US Airways [and] good for the entire industry. We're going to take out 4% of the industry capacity as we did that. Everyone's 2008 numbers would look a (expletive) of a lot better had that
transaction happened . . . .

In 2008, Delta merged with Northwest Airlines. Despite promises to the contrary, the combined airline reduced capacity, including significant cuts at its former hubs in Cincinnati and
Memphis. US Airways' CEO was "quite happy" to see the merger and advocated for further consolidation. He explained that an industry structure of "five different hub and spoke airlines
with who knows how many hubs across the United States . . . results in all of us fighting for the same connecting passengers over numerous hubs." Left unsaid was

that fewer airlines meant
less competition and higher fares.

In May 2010, United Airlines and Continental Airlines announced their planned merger. The announcement caused speculation about the future of each airline's hubs, including Continental's Cleveland hub. In Congressional testimony, an industry analyst stated that he did not believe the merger would cause reductions in Cleveland. On June 18, 2010, upon seeing the testimony, US Airways' CEO wrote an email to other US Airways executives stating, "[s]urely
these guys [United/Continental] aren't really planning to keep Cleveland open. I'm hopeful they're just saying what they need to (including to [the analyst]) to get this approved." United
and Continental closed their deal on October 1, 2010. The combined firm has reduced capacity at nearly all of its major hubs (including Cleveland) and at many other airports where the two airlines previously competed. Similarly, Southwest/AirTran has reduced service in a number of its focus cities and on many of AirTran's former routes following its 2011 merger.

The defendants are fully aware of these earlier mergers' effects. A 2012 American Airlines analysis concluded that "following a merger, carriers tend to remove capacity or grow more slowly than the rest of the industry." US Airways' management concluded that although industry consolidation has been a success, as its CEO stated publicly in 2010, the industry had yet to hit its "sweet spot," and additional consolidation was needed because the industry remained "overly fragmented."

A merger with American would allow US Airways to hit the "sweet spot." For consumers, however, it would be anything but sweet. US Airways believes that merging with American "finishes industry evolution" by accomplishing US Airways' goal of "reduc[ing] capacity more efficiently." When first considering a combination with American, US Airways projected that the merged firm could reduce capacity by as much as 10 percent. Similarly, American expects that the merger will lead to capacity reductions that would negatively impact "communities," "people," "customers," and "suppliers." Higher fares would be right around the corner.

111.    The DOJ ultimately settled the case, allowing the merger to occur, conditioned upon the

divestiture of certain flight slots. The merger has been consummated, resulting in significant further

consolidation, and U.S. Airways ceased formal existence in October of 2015.[42]

---

[42] https://www.google.com/webhp?sourceid=navclient&ie=UTF-8&gws_rd=ssl#q=us+airways.

112.    One casualty of the merger was U.S. Airways' Advantage, which offered significant discounts on connecting flights.[43] Pursuant to the program, price sensitive customers could get discounted fares, especially for last minute bookings. The DOJ illustrated comparing fares for a trip from Houston to New York City on August 13, with a return trip on August 14. U.S. Airways offered a one-stop fare from $575, while the prices for United, Delta and American were from $1331, $1467 and $1467, respectively.[44]

113.    Defendants' past willingness to violate the antitrust laws and their current ability to communicate directly or indirectly with another regarding pricing and capacity practices indicate that the industry is susceptible to collusion.

## ACCRUAL OF CLAIM, CONTINUING VIOLATION, EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT

114.    Plaintiff did not discover and could not discover through the exercise of reasonable diligence the existence of the conspiracy alleged herein prior to the 2015 comments cited in this complaint. Before Defendants' recent coordinated statements regarding "capacity discipline," it was not reasonably apparent that they were each engaged in the same practices.

115.    Defendants and their co-conspirators have committed continuing violations of the antitrust laws resulting in monetary injury to Plaintiff and the Class members. These violations constitute injurious acts that restart the applicable statute of limitations each time they are committed.

116.    In addition, Defendants' and their co-conspirators' agreement, understanding, and conspiracy in violation of the antitrust laws was kept secret. As a result, Plaintiff and the Class members were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying

---

[43] http://marketrealist.com/2014/07/overview-impact-eliminating-advantage-fare-program/.

[44] http://www.mcclatchydc.com/news/nation-world/national/economy/article26083942.html.

supracompetitive prices for domestic airline tickets throughout the Class Period. Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

117.    Plaintiff and the Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was initially commenced, because Defendants and their co-conspirators used deceptive and secret methods to avoid detection and to affirmatively conceal their violations.

118.    Neither defendants nor their co-conspirators told Plaintiff or other Class members that they were fixing prices, or engaging in other unlawful collusive practices alleged herein. By its very nature, Defendants' and their co-conspirators' conspiracy was inherently self-concealing.

119.    No information in the public domain was available to Plaintiff and members of the Class prior to the announced DOJ investigation on July 1, 2015, which revealed sufficient information to suggest that Defendants were involved in an anticompetitive conspiracy to restrain trade in the market for air passenger transportation services.

120.    Defendants' and their co-conspirators' collusive acts in furtherance of their conspiracy were inherently self-concealing and carried out in a manner that defied and precluded detection by Plaintiffs and members of the Class.

121.    Because Defendants and their co-conspirators successfully and actively concealed the existence of their conspiracy, prior to July 1, 2015, Plaintiff and members of the Class were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for passenger airline fares.

122.    Moreover, Plaintiff and members of the Class could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy. The conspiracy as alleged herein was fraudulently concealed by Defendants

through various means and method, including, but not limited to, secret meetings and surreptitious communications among Defendants by the use of telephone and/or in-person meetings at trade association gatherings (and elsewhere) in order to prevent the existence of written records.

123.    Defendants have denied collusive activity.  On July 2, 2015, Airlines for America, the trade group to which Defendants belong, stated

> that investigators will not be able to find any signs of collusion among U.S. airlines, despite the recent trend of consolidation within industry.
>
> "We are confident that the Justice Department will find what we know to be true: our members compete vigorously every day, and the traveling public has been the beneficiary, as domestic fares are actually down thus far in 2015," the group said in a statement.[45]

124.    As detailed in the 2013 DOJ complaint and the 2015 AAI letter to DOJ, the airline mergers were often preceded by assurances that airline capacity would not be reduced and, in point of fact, capacity reductions did thereafter occur.

125.    In their Form 10-Ks filed with the Securities & Exchange Commission, the Defendants have stated repeatedly that they operate in a highly competitive market and that intense competition occurs on routes, prices, services and the like.[46]

126.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators until July 1, 2015, Plaintiff and the members of the Class had no knowledge of the alleged conspiracy or of any facts or information which would have caused a reasonably

---

[45] http://thehill.com/policy/transportation/246780-airlines-we-compete-vigorously-every-day.

[46] *See, e.g.*, http://phx.corporate-ir.net/phoenix.zhtml?c=117098&p=irol-SECText&TEXT=aHR0cDovL2FwaS50ZW5rd2l6YXJkLmNvbS9maWxpbmcueG1sP2lwYWdlU1sP2lwYWdlPTEwMDk5MTk1JkRTRVE9MCZTRVE9MCZTUUREU0VRRU0M9U0VDRElPTl9FTlRJRUUUmc3Vic2lkPTU3;
http://ir.delta.com/files/Annual%20Meeting/2015/2014-DAL-10-K_v001_j37ksn.PDF;
http://www.sec.gov/Archives/edgar/data/92380/000009238015000027/luv-12312014x10k.htm;
http://ir.united.com/phoenix.zhtml?c=83680&p=irol-SECText&TEXT=aHR0cDovL2FwaS50ZW5rd2l6YXJkLmNvbS9maWxpbmcueG1sP2lwYWdlPTEwMDk5MTk1JkRTRVE9MCZTRVE9MCZTUUREU0VRRU0M9U0VDRElPTl9FTlRJRUUUmc3Vic2lkPTU3.

diligent person to investigate whether a conspiracy existed.

127.    On information and belief, Defendants and their co-conspirators engaged in a successful conspiracy that resulted in artificially inflated prices, which they affirmatively concealed.

## VIOLATIONS OF THE ANTITRUST LAWS

128.    Beginning by July 14, 2011 and continuing through the present, Defendants have engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize the prices of domestic airline tickets in the United States.

129.    Defendants engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, or stabilize the price of domestic airline tickets sold in the United States. These activities included:

  a. Participation in meetings, conversations, and communications to discuss the price of domestic airline tickets, capacity discipline and supply restrictions;

  b. Agreements during those meetings, conversations, and communications to charge prices at, to set capacity at and to restrict supply to specified levels and otherwise to fix, raise, maintain, or stabilize the price of domestic airline tickets sold in the United States; and

  c. Taking numerous steps, as set forth above, to implement and maintain the conspiracy.

130.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

131.    Throughout the Class Period, Plaintiff and the other Class members purchased domestic airline tickets directly from Defendants (or their subsidiaries or controlled affiliates) at supracompetitive prices.

132.    Defendants' contract, combination, or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, as discussed *supra*.

**ANTI-COMPETITIVE EFFECTS**

133.    As a result of Defendants' unlawful conduct, Plaintiff and other Class members have been injured in their business and property because they have paid more for domestic airline tickets than they would have paid absent Defendants' collusion.

134.    Defendants' unlawful contract, combination, or conspiracy has had at least the following effects:

    a.  Price competition in the market for domestic airline tickets has been artificially restrained;

    b.  Prices for domestic airline tickets sold by Defendants have been raised, fixed, maintained, or stabilized at supracompetitive levels; and

    c.  Purchasers of domestic airline tickets from Defendants have been deprived of the benefit of free and open competition in the market for domestic airline tickets.

**CLAIMS FOR RELIEF**
**FIRST CLAIM FOR RELIEF**
**Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act**

135.    Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

136.    Beginning by at least July 14, 2011 and continuing thereafter to the present, Defendants, by and through their officers, directors, employees, agents, or other representatives, conspired to fix, raise, maintain, or stabilize prices of domestic airline tickets in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

137.    Defendants entered into an agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize prices for domestic airline tickets in the United States.

138.    Defendants entered into an agreement, understanding, and conspiracy in restraint of trade to impose capacity restrictions in furtherance of their conspiracy to fix, raise, maintain, or stabilize prices of domestic airline tickets in the United States.

139.    As a result of Defendants' unlawful conduct, Plaintiff and other members of the Class have been injured in their property in that they have paid more for domestic airline tickets than they otherwise would have paid absent Defendants' misconduct.  Plaintiff and members of the Class are thus entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

140.    The alleged contract, combination or conspiracy among competitors constitutes a per se violation of the federal antitrust laws.

## PRAYER FOR RELIEF

141.    WHEREFORE, Plaintiff demands judgment against Defendants as follows:

a.    Declaring this action to be a proper class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein;

b.    That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants be adjudged to have violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

c.    That each of the Defendants, successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining and renewing the combinations, conspiracy, agreement, understanding or concert of action as alleged herein;

d.    That judgment be entered for Plaintiff and the Class members against Defendants for three times the amount of damages sustained as allowed by law;

e.    That Plaintiff and the members of the Class recover pre-judgment and post-judgment interest as permitted by law;

f.    That Plaintiff and the members of the Class recover their costs of the suit, including attorneys' fees, as provided by law;

g.    For such other and further relief as is just and proper under the circumstances.

## JURY DEMAND

142.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims asserted in this Complaint so triable.

Dated:  November 10, 2015                    **FINKELSTEIN THOMPSON LLP**

By: /s/ *Michael G. McLellan*
     Michael G. McLellan

     Michael G. McLellan (Bar #489217)
     FINKELSTEIN THOMPSON LLP
     1077 30th Street NW, Suite 150
     Washington, D.C. 20007
     Tel:  (202) 337-8000
     Fax:  (202) 337-8090
     mmclellan@finkelsteinthompson.com

     BLOCK & LEVITON LLP
     Whitney E. Street
     Lesley E. Weaver
     520 Third Street, Suite 108
     Oakland, CA 94607
     Telephone: (415) 968-8999
     Facsimile:  (617) 507-6020
     wstreet@blockesq.com
     lweaver@blockesq.com

     Erica G. Langsen
     155 Federal Street
     Suite 400
     Boston, MA 02110
     Telephone: (617) 398-5600
     Facsimile:  (617) 507-6020
     elangsen@blockesq,com

     MORGAN & MORGAN
     Peter Safirstein
     Roger A. Sachar Jr.
     Morgan & Morgan
     28 West 44th Street, Suite 2001
     New York, NY  10036
     Phone: (212) 564-1637
     Facsimile: (212) 564-1656
     PSafirstein@MorganSecuritiesLaw.com
     RSachar@MorganSecuritiesLaw.com

     *Counsel for Plaintiff*